IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs September 20, 2017

## STATE OF TENNESSEE v. MATTHEW BRUCE HOWARD

**Appeal from the Criminal Court for Cumberland County**
**No. 15-153    Gary McKenzie, Judge**

_____

### No. E2017-00723-CCA-R3-CD

_____

The Appellant, Matthew Bruce Howard, pled guilty to second degree murder, and the trial court sentenced him to twenty-five years in the Tennessee Department of Correction. On appeal, the Appellant challenges the length of the sentence imposed by the trial court, arguing that the trial court erred by enhancing his sentence because he abused a position of private trust. Upon review, we agree that the trial court erred by finding that the Appellant abused a position of private trust, but we nevertheless affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Kevin R. Bryant, Crossville, Tennessee, for the Appellant, Matthew Bruce Howard.

Herbert H. Slatery III, Attorney General and Reporter; Linda D. Kirklen, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Philip Hatch, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The Appellant was charged with the first degree murder of his girlfriend, Tara Burnett, but eventually he pled guilty to second degree murder. Pursuant to statute, the Appellant was required to serve one hundred percent of the sentence for the second degree murder conviction in confinement. See Tenn. Code Ann. § 40-35-501(i)(1),

(2)(B). The plea agreement provided that the Appellant would be sentenced as a Range I, standard offender and that the trial court would determine the length of the sentence.

To provide a factual basis for the plea, the State called Tennessee Bureau of Investigation (TBI) Agent Dan Friel. Agent Friel testified the State's proof would be that around 3:00 a.m. on February 16, 2015, the Appellant called Cumberland County 911 to report a shooting at a residence on Kings Down Road. Cumberland County Sheriff's Captain Jerry Jackson asked Agent Friel to come to the scene. After the police obtained a search warrant for the residence, they found the victim's body in the master bedroom. The police also found a .22 caliber rifle and a shell casing in the residence. Testing revealed that the shell casing had been fired from the rifle. The caliber of the round was "consistent with the gunshot wound sustained by" the victim. The victim's body was taken to the medical examiner's office where her manner of death was determined to be a gunshot wound to the left temple.

At some point, Agent Friel and Investigator David Moore spoke with the Appellant. Agent Friel said that the Appellant

> told us that he had woke up early that morning, and when he woke up, he saw a white individual standing by his bed, and a black individual standing by the bathroom area. He said he reached over to get his .22 caliber rifle. At that time, he saw [the victim] sitting up in the bed holding two, what he believed were Glock handguns, and at that time, he shot her. He shot her in the temple area of the left side of her head.

Agent Friel said the police determined that all of the doors of the Appellant's residence were locked from the inside, and they found no indications of forced entry. Additionally, the police did not find any Glock handguns. The trial court accepted the Appellant's guilty plea and scheduled a sentencing hearing.

At the sentencing hearing, Chad McCaleb with the Tennessee Department of Correction testified that he prepared the Appellant's presentence report. The Appellant had no prior convictions, and he had a general equivalency diploma (GED). The Appellant was last employed in April 2014, approximately ten months prior to the victim's death.

Agent Friel testified that the victim was shot in the head with a .22 caliber rifle and that the rifle was found in the bedroom in which her body was found. Agent Friel said that his investigation revealed that the victim was sleeping at the time she was shot, which contradicted the Appellant's version of events. From his investigation, Agent Friel learned that the victim and the Appellant were living together, and they were in a

"romantic relationship" that was "at times, . . . very heated, argumentative." Agent Friel acknowledged that he spoke with the victim's mother, Cindy Rifner, and that, based on his conversations with her, "trust was a portion of the relationship" the victim had with the Appellant.

On cross-examination, Agent Friel agreed that "as it relates to this issue of trust, [his] investigation didn't turn up anything that was any different than anyone else who lives together, shares a place together; it was a normal boyfriend/girlfriend relationship in that regard[.]"

Cindy Rifner, the victim's mother, testified that the victim and the Appellant were in a relationship for approximately eight years and that at the time of the victim's death, they were living together. Rifner said that she "saw signs of emotional abuse" and that the family tried "to include [the Appellant] in family gatherings, for [the victim's] sake." However, "[t]hat didn't work out." Rifner also saw "marks" on the victim's face. Regardless, she did not anticipate that the Appellant would kill the victim. Rifner said the victim "blamed herself that, you know, she should have taken better care of him, or she shouldn't have worked as long, or there were things that she needed to do for him that he wanted done. She wasn't afraid of him. She trusted him."

Rifner next read her victim impact statement to the court. She stated that the victim was a "beautiful soul" who smiled often and "tr[ied] to make others happy." Rifner said the victim's family knew the Appellant had emotionally and physically abused the victim, but they did not know "how bad the abuse was." The family was unsure of how to "handle [the] abuse situation[] without losing" the victim. Rifner said that the victim took care of the Appellant, allowed him to live in her home, fed him, bought his medicine, and paid his bills and child support payments. Rifner said that the victim did not complain about how the Appellant treated her, but she began to plan for a better life, and the Appellant "couldn't let her go."

Rachel Love, the victim's co-worker and friend, stated that the victim was a "feisty little light" and a "beautiful, strong, hard-working, wonderful person." Love saw a "major change" the first time the victim came to work with "a huge bruise on her face." The victim initially lied about the cause of the bruise but eventually stated that the Appellant had hit her. Afterward, the victim came to work on several occasions with bruises on her face or her body. Love said that each time, the victim "los[t] a little piece of herself and bec[a]me embarrassed." Love said that the victim declined invitations to visit Love's home because she did not want to displease the Appellant.

Sandra Burnett, who was married to the victim's father, testified that the Appellant's claim that the victim had "Glocks" was "the most outrageous thing I've . . . ever heard." Ms. Burnett said that the victim's character was "impeccable" and that she

was close to her family. Ms. Burnett said that the victim thought she could "fix" the Appellant but that "he wasn't fixable." The Appellant took financial advantage of the victim, her father, and Ms. Burnett. The Appellant did not work, and the victim took care of him and paid his child support payments.

Joey Burnett, the victim's brother, was the last person to read a victim impact statement to the court. He said that the victim was "a bright light" and "was very fierce in the love she had for everyone," including the Appellant. He noted that "[o]ver four hundred people came to pay respects [to the victim] . . . during the destruction that the ice storm caused." Mr. Burnett said that he had seen bruises on the victim and that she had asked him not to do anything to the Appellant. He acquiesced to her wishes, but it was difficult for him not to intercede. Mr. Burnett said that the victim "protected" the Appellant and that she was "the only reason why nothing ever happened" to him.

The Appellant made an allocution to the court during which he stated that the "allegations of domestic violence are completely false against [him]." He said that he did not think he should have been interviewed on the night of the shooting, explaining that he had "hardly any memory from that night" and had "no memory from an interview where [he] said that she pointed a gun at [him] or anybody else." The Appellant acknowledged that the victim did not like guns. He said that he told the victim "every day how sorry [he was] for what happened."

As enhancement factors, the trial court found that the Appellant employed a firearm during the commission of the offense and that he violated a position of private trust; the court gave those factors great weight. The court also found that the Appellant had shown no remorse for his conduct. The trial court noted as a potential mitigating factor that the Appellant had no prior criminal convictions; however, it gave that factor little weight. The court sentenced the Appellant to twenty-five years. On appeal, the Appellant challenges the length of sentence imposed by the trial court, arguing that the trial court should not have found that he violated a position of private trust.

## II. Analysis

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct

- 4 -

involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

As we stated earlier, the trial court enhanced the Appellant's sentence by applying enhancement factor (9), that the Appellant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense, and enhancement factor (14), that the Appellant abused a position of private trust. Tenn. Code Ann. § 40-35-114(9) and (14). On appeal, the Appellant argues that the trial court incorrectly applied enhancement factor (14). The State responds that the trial court correctly applied

enhancement factor (14) and that, regardless of any error, the length of the sentence imposed was appropriate based upon the application of enhancement factor (9). We agree with the State that the length of the sentence is appropriate.

In State v. Gutierrez, 5 S.W.3d 641, 645 (Tenn. 1999), our supreme court recognized that in cases where an "adult perpetrator and minor victim are members of the same household, the adult occupies a position of 'presumptive private trust' with respect to the minor." However, the court determined that a presumption of a private trust does not exist in cases where the perpetrator and the victim are both competent adults who share a household or are in a relationship because, unlike minor victims, adult victims generally have reasonable judgment and can function independently. Id. Accordingly, trial courts must examine "'the nature of the relationship'" to determine "whether that relationship 'promoted confidence, reliability, or faith'" because such a relationship "usually includes a degree of vulnerability." Id. at 646 (quoting State v. Kissinger, 922 S.W.2d 482, 488 (Tenn. 1996)). Our supreme court explained that "[i]t is the exploitation of this vulnerability to achieve criminal purposes which is deemed more blameworthy and thus . . . the enhancement factor . . . is construed to apply only where there is evidence that the nature of the relationship between the perpetrator and the adult victim caused the victim to be particularly vulnerable." Id. The State must also show "that the perpetrator abused that relationship in committing the crime." Id. Finally, our supreme court cautioned that "[a]s with all determinations regarding the application of an enhancement factor, the utilization of this analysis 'is a task that must be undertaken on a case-by-case basis.'" Id. (quoting State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997)).

Applying the foregoing analysis, our supreme court noted that Gutierrez and his girlfriend, the victim, were in a relationship and living together; he became angry when she discussed ending the relationship, and he beat her before shooting and killing her. Id. at 643. The court noted that the record contained few details concerning the nature of their relationship. Id. at 646. Therefore, because the record did not demonstrate "the existence of a relationship which promoted a reliance, confidence, and faith that created a vulnerability on the part of the adult victim," the court found that the trial court erred by enhancing the defendant's sentence for his voluntary manslaughter conviction based upon an abuse of a position of private trust. Id.

Citing Gutierrez, the Appellant argues that the trial court erred by applying enhancement factor (14) to the instant case. We agree. We acknowledge that the trial court attempted to distinguish the instant case from Gutierrez by stating that the Appellant's relationship with the victim had "issues" but that they nevertheless had "a trusting domestic relationship." However, this court repeatedly has reasserted the supreme court's reasoning in Gutierrez that

to use the mere sharing of a household or the existence of a relationship to determine whether a position of private trust exists between competent adults can result in an overly-broad application of the enhancement factor. The mere existence of such a relationship does not render that perpetrator more culpable than one who has a different relationship or no relationship with the victim.

Id. at 645-46 (footnote omitted); see State v. Terrence Lamont McDonald, No. E2013-02524-CCA-R3-CD, 2015 WL 154251, at *19 (Tenn. Crim. App. at Knoxville, Jan. 13, 2015) (maintaining that the mere existence of a marital relationship was insufficient to warrant the application of the enhancement factor); State v. Jeffrey Scott, No. W2009-00707-CCA-R3-CD, 2011 WL 2420384, at *33 (Tenn. Crim. App. at Jackson, June 14, 2011) (stating that relying on the marital vow to protect a spouse in order to justify the application of the enhancement factor would result in the overly broad application of the enhancement factor in every case where one spouse commits a crime against the other spouse); State v. Terry Edward Jones, No. E2004-01300-CCA-R3-CD, 2005 WL 1219979, at *5 (Tenn. Crim. App. at Knoxville, May 24, 2005) (asserting that the application of the enhancement factor is not dependent upon the mere existence of a relationship but upon the exploitation of a vulnerability caused by the relationship). Accordingly, we conclude that the trial court erroneously applied this enhancement factor.

Regardless, the Appellant does not dispute the trial court's application of enhancement factor (9), to which the court gave great weight. We conclude that the length of the Appellant's sentence was justified by the application of this enhancement factor alone. State v. James Moore, No. W2015-01483-CCA-R3-CD, 2016 WL 7654955, at *5 (Tenn. Crim. App. at Jackson, Aug. 23, 2016) (stating that "the application of a single enhancement factor is sufficient to justify the imposition of the maximum sentence in the range, even when mitigating factors are also applied"), perm. to appeal denied, (Tenn., Dec. 15, 2016).

### III. Conclusion

The trial court's judgment is affirmed.

_____
NORMA MCGEE OGLE, JUDGE